# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARCUS R. WILLIAMS,

           Plaintiff,

     v.

M. YARBOROUGH, et al.,

           Defendants.

_____/

CASE NO. 1:02-cv-05094-AWI-SMS P

FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED

(Doc. 91)

OBJECTIONS DUE WITHIN THIRTY DAYS

I.    <u>Defendants' Motion for Summary Judgment</u>

    A.    <u>Procedural History</u>

        Plaintiff Marcus R. Williams ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action for damages is proceeding on plaintiff's second amended complaint, filed August 21, 2003, against defendants Witcher and Yarborough on plaintiff's Eighth Amendment denial of exercise claim, and against defendant Yarborough on plaintiff's equal protection claim.[1]  (Docs. 24, 66.)  On January 27, 2005,

---

[1] Defendants in their motion for summary judgment and plaintiff in his opposition reference a pending RLUIPA claim.  However, this action is one for damages and defendants were granted qualified immunity on plaintiff's RLUIPA claim.  (Doc. 66.)  Therefore, only plaintiff's equal protection and Eighth Amendment claims remain pending, and are addressed in this Findings and Recommendations.

    In any event, plaintiff is no longer housed at the California Correctional Institution in Tehachapi, where the events at issue in this action occurred.  When an inmate seeks injunctive or declaratory relief concerning the prison where he is incarcerated, his claims for such relief become moot when he is no longer subjected to those conditions.  <u>Dilley v. Gunn</u>, 64 F.3d 1365, 1368 (9th Cir. 1995); <u>Johnson v. Moore</u>, 948 F.2d 517, 519 (9th Cir. 1991).  Additionally, the grooming regulation governing hair length has been amended and hair may now be maintained at any length.  (Undisputed Fact 24.)  Although plaintiff asserts that Operational Procedure 111R, which is at issue in this action and which in relevant part sets forth restrictions on inmates not in compliance with the grooming regulation, is still in effect, there is no evidence of this and the court notes that plaintiff was transferred from CCI

1

plaintiff's Eighth Amendment medical care claim and access to the courts claim were dismissed without prejudice for failure to exhaust the available administrative remedies, plaintiff's free exercise claim was dismissed with prejudice for failure to state a claim, plaintiff's RLUIPA claim was dismissed on qualified immunity grounds, and defendants Taylor, Peeler, Hirsh, Yin, and Peterson were dismissed as no claims remained pending against them. (Doc. 66.) On June 1, 2006, remaining defendants Witcher and Yarborough ("defendants") filed a motion for summary judgment. (Docs. 91, 92.) Plaintiff filed an opposition on July 21, 2006, and defendants filed a reply on July 31, 2006.[2] (Docs. 97, 98.)

      B.   <u>Legal Standard</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id</u>. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id</u>. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id</u>. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id</u>. at 323.

shortly after this suit was filed and long before the grooming regulation was amended.

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on January 14, 2004. <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988). (Doc. 33.)

1   If the moving party meets its initial responsibility, the burden then shifts to the opposing

2   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

3   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

4   of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

5   required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

6   material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586

7   n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

8   might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477

9   U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

10  (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

11  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

12  (9th Cir. 1987).

13  In the endeavor to establish the existence of a factual dispute, the opposing party need not

14  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

15  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

16  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

17  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

18  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

19  amendments).

20  In resolving the summary judgment motion, the Court examines the pleadings, depositions,

21  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).

22  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

23  inferences that may be drawn from the facts placed before the Court must be drawn in favor of the

24  opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655

25  (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing

26  party's obligation to produce a factual predicate from which the inference may be drawn.  Richards

27  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

28  Cir. 1987).

1       Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

2  that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole

3  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

4  trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

5       C.    Undisputed Facts[3]

6  1.    Plaintiff is a California prisoner serving a term of thirty years to life for first-degree murder,

7       possession of a firearm by a felon, attempted robbery, and attempted residential burglary in

8       violation of California Penal Code sections 187(a), 211, 213, 459, 664, and 12021(a).

9  2.    At times relevant to the claims at issue, plaintiff was confined at the California Correctional

10      Institution (CCI) in Tehachapi, California.

11  3.    Defendant Yarborough was the Warden, and defendant Witcher was a Facility Captain at

12      CCI at times relevant to the claims at issue.

13  4.    Plaintiff is African-American, a Rastafarian, and a member of the East San Diego MOB Crip

14      gang.  Plaintiff currently wears his hair in dreadlocks and claims that cutting his hair violates

15      his religious beliefs.  Since his incarceration, plaintiff has worn his hair long, short and

16      almost bald, medium length, braided, and in dreadlocks.

17  5.    On August 11, 1999, plaintiff was transferred from a general population housing unit in

18      Facility 4A at CCI to the Security Housing Unit (SHU) in that facility to serve an eighteen-

19      month sentence for battery on a non-inmate without serious injury and a concurrent six-

20

21       [3] "Any party opposing a motion for summary judgment or summary adjudication shall reproduce the

22  itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those facts
that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit,
deposition, interrogatory answer, admission or other document relied upon in support of that denial."  Local Rule 56-

23  260(b).  In this instance, plaintiff did not comply with the Local Rule.  Therefore, defendants' Statement of
Undisputed Facts is accepted as true except where brought into dispute by plaintiff's verified second amended

24  complaint and opposition.  Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Johnson v. Meltzer, 134 F.3d 1393,
1399-1400 (9th Cir. 1998).  Plaintiff's second amended complaint and opposition are treated as opposing affidavits

25  only to the extent that they set forth admissible facts within plaintiff's personal knowledge and not based merely on
plaintiff's belief, and to which plaintiff is competent to testify.  Johnson, 134 F.3d at 1399-1400; McElyea v. Babbitt,

26  833 F.2d 196, 197-98 (9th Cir. 1987); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985).  For example,
plaintiff's conclusory assertions that he "makes no admission of guilt" regarding various Rules Violations Reports

27  does not bring into dispute the evidence submitted by defendants concerning disciplinary violations plaintiff was
charged with and convicted of.  (Doc., 97, Opp., 9:15-27.)

28

month term for battery on an inmate.  During the transfer process, plaintiff failed the SHU Intake metal detector five times.  Plaintiff admitted to correctional officers that he had contraband in his rectum and agreed to surrender it.  Plaintiff defecated into a bucket, and officers retrieved two bindles. One bindle contained nine single-edged razor blades, tobacco, matches, a striker, and two hand-rolled cigarettes suspected of containing marijuana.  The other bindle contained two zip lock bags, a toilet paper wrapper, and six lists of words translated from Swahili to English.  After removing the contraband, plaintiff cleared the metal detector.  As a result of this violation, plaintiff received a consecutive fifteen-month term for possession of slashing weapons.

6.   While housed in the Facility 4A SHU, plaintiff committed several disciplinary violations that resulted in enhancements of his SHU term.  The violations included mutual combat with an inmate on the Crips exercise yard, and delaying a peace officer by refusing to uncover his cell window on one occasion and by refusing to be handcuffed on another.

7.   Records for the time plaintiff was housed in the Facility 4A SHU show that he regularly went to the exercise yard until April and May 2001, when he refused yard on five occasions, before again going to yard on May 8, 2001.

8.   On May 22, 2001, a classification committee reviewed plaintiff's SHU placement and retained him on the Control/Compatible (C/C) Crip #1 Exercise Yard based on his request and on a review of his file.

9.   On May 29, 2001, plaintiff was moved to the Facility 4B SHU.  A week later, plaintiff was seen by a classification committee there for his initial SHU review.  Defendant Witcher was a member of that committee.  The committee assigned plaintiff to the C/C Crip # 15 Exercise Yard.  Plaintiff claims that defendant Witcher told him that unless he shaved his dreadlocks, he would not be allowed access to the exercise yard to which he was assigned and that as long as he had dreadlocks, he would only be allowed out of his cell to shower.

10.  During the relevant time period, departmental regulations provided that a male inmate's hair must not be longer than three inches and shall not extend over the eyebrows or below the top of the shirt collar while standing upright.  Hair must be cut around the ears, and sideburns

5

shall be neatly trimmed, and must not extend below the mid-point of the ear.  The width of the sideburns can not exceed one and one-half inches and shall not include flared ends.  An inmate who fails to comply with the grooming standards may be deemed a program failure and be subject to progressive discipline and classification committee review for appropriate housing and program placement.  Physical force is not used to enforce compliance, except as allowed under by law or with a court order.

11.  The grooming regulations were promulgated to promote inmate personal hygiene and to aid in the security of the prisons and to protect the safety of the public.  Prison officials stated that uniform grooming standards would assist in the identification of particular inmates who were outside their approved areas, would aid in the identification of prisoners responsible for creating disturbances, and would promote hygienic and healthy living conditions in the prison.  Prison officials noted that discipline and respect for authority required prisoners to accede to the need for quick identification of persons and their gender.  Health and safety required hygienic conditions and the ability to effectively use safety devices, such as eye shields, headgear, and face masks.  Uniform appearance would reduce animosity among prisoners based on individual loyalties or preferences.  Grooming standards were expected to promote a positive self-image in prisoners and to aid in facilitation employment opportunities upon release from custody.  The grooming standards regarding hair length were different for female inmates because each gender's needs, physical, psychological and behavioral differences, and societal standards.  Prison officials found that historically female prisoners had not been as violent as male prisoners, had not engaged in a great number of physical altercations, had not produced the weapons and attack instruments used by male prisoners, and had not posed the same level of escape risk.  Thus, prison officials found that what might create a security concern in a male facility might not do so in a female facility.  In particular, prison officials found that limiting the length of a male prisoner's hair to three inches would facilitate searches, making it difficult to hide contraband in hair or for the hair to mat, which makes it difficult for staff to search an inmate's hair.  The grooming regulation was expected to reduce the time officers had to spend searching inmates.  The grooming

regulations also would make it difficult for an inmate to substantially alter his appearance which could aid in an escape.

12. Because inmates in the SHU are disciplinary problems, they often refuse to comply with prison rules, including the grooming regulations, even where they have no religious reason for not complying. Correctional officers still must ensure the safety and security of staff, inmates, and the institution when dealing with SHU inmates with long hair. Moreover, SHU inmates often have a history of in-prison violence, and they require more restrictive safety and security measures than used on lower security inmates.

13. The procedures for searching inmates in the Facility 4B SHU when they left their cells for activities such as the exercise yard were set forth in CCI Operational Procedure No. 111 (Restricted) - Security Housing Unit & Administrative Segregation (OP 111R).

14. Under OP 111R, SHU inmates like plaintiff who wore their hair in dreadlocks and who refused to cut it to comply with prison regulations, were required to separate the hair before leaving their cells to make searching and inspecting it easier. Staff were authorized to remove an inmate with braids or dreadlocks from the cell for escort to medical emergencies, showers, or for cell searches. Staff were required to wand the inmate's hair with a hand-held metal detector before escorting the inmate and conduct a thorough visual inspection. The metal wand, however, would not disclose the presence of non-metallic objects in the dreadlocks, such as weapons that inmates make from plastic or other non-metallic materials.

15. On June 11, 2001, plaintiff was charged with a disciplinary violation for possession of inmate-manufactured alcohol when officers found "pruno" in a plastic bag wrapped in a blanket under the bottom bunk. The same day, he was placed on the exercise yard because he said he was going to cut his hair. However, when he returned he had not cut the hair, but had only tacked his braids under his hair to conceal them from staff.[4] Except for this

---

[4] The court acknowledges the distinguishment of dreadlocks from braids set forth in plaintiff's second amended complaint, and plaintiff's allegation that he has dreadlocks. (2nd Amend. Comp., 10:17-26.) However, OP 111R applies to both dreadlocks and braids, and the resolution of defendants' motion is not dependent on the distinguishment of dreadlocks from braids. For that reason, the court leaves as is defendants' usage of the term braids when perhaps they should have said dreadlocks.

occasion, plaintiff did not go to the yard when he was housed in the Facility 4B SHU.

16.   On June 15, 2001, a correctional officer counseled plaintiff for noncompliance with the grooming regulations because his hair was approximately six inches long. Later that day, the same officer charged plaintiff with delaying an officer in the performance of his duties when plaintiff twice refused to take down some non-transparent paper covering his cell door window.

17.   On July 26, 2001, plaintiff was charged with a disciplinary violation for refusing to accept a compatible cell mate.  Plaintiff said, "I don't want a cellie."  As a result, a sergeant suspended plaintiff's scheduled yard time until a classification committee could review his yard needs.

18.   On July 30, 2001, plaintiff was charged with a disciplinary violation for having braids that were six to ten inches long in violation of the grooming standards.  The reporting employee later noted that plaintiff's hair was approximately thirteen inches long in places.

19.   On August 12, 2001, a correctional officer who was processing inmates for the exercise yard noted that plaintiff had not removed and separated his braids before leaving his cell to go to the yard as required by CCI Operational Procedure No. 111R.  Plaintiff also refused to use the hair clippers available on the yard to cut his hair to conform with regulations limiting the length of an inmate's hair to three inches.

20.   On November 6, 2001, a classification services representative approved plaintiff's release to the general population upon the expiration of his SHU term and approved his transfer to Pelican Bay State Prison, Facility IV.

21.   Plaintiff's SHU term expired on December 10, 2001, and he was placed in administrative segregation pending his transfer to another institution.

22.   On December 27, 2001, plaintiff was transferred from the Facility 4B SHU to the general population.

23.   Plaintiff is currently confined at the California State Prison - Corcoran (CSP-Corcoran).

24.   On January 27, 2006, the California Department of Corrections and Rehabilitation (CDCR) adopted new inmate grooming programs.  The California Code of Regulations were amended

1    to allow inmates to maintain their hair at any length, not to extend over the eyebrow or cover

2    the inmate's face.

3        D.    Plaintiff's Claims

4        In his second amended complaint, plaintiff alleges that between May 29, 2001, and December

5    27, 2001, while on IV-B SHU at CCI, he was denied regular, out-of-cell exercise pursuant to

6    Operational Procedure 111, which provides that inmates with braids/dreadlocks may only be

7    removed from their assigned cells while being escorted for a medical emergency, a shower, or a cell

8    search.  Plaintiff alleges that OP 111 is racist in that it targets African-American prisoners and is

9    sexist.  Plaintiff alleges claims for violation of the Equal Protection Clause on the basis that OP 111

10   is a discriminatory policy and for violation of the Eighth Amendment for denial of adequate out-of-

11   cell exercise.

12            1.    Equal Protection Claim

13       Pursuant to Operational Procedure 111R, SHU inmates who wore their hair in dreadlocks or

14   braids were only removed from their assigned cells while being escorted for a medical emergency,

15   a shower, or a cell search.  (U.F. 14; 2nd Amend. Comp., 9:18-21.)  Turning first to race, the policy

16   is facially neutral and plaintiff does not argue otherwise.  Rather, plaintiff argues that the policy

17   "unjustly targets African-American prisoners . . ." because dreadlocks and braids "are commonly

18   worn by African-Americans . . . ."  (2nd Amend. Comp., 10:17-18 & 11:2; Opp., 7:26-8:2.)

19       "The Equal Protection Clause . . . is essentially a direction that all persons similarly situated

20   should be treated alike."  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985) (citing

21   Plyler v. Doe, 457 U.S. 202, 216 (1982)).  "'To state a claim under 42 U.S.C. § 1983 for a violation

22   of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the

23   defendants acted with an intent or purpose to discriminate against the plaintiff based upon

24   membership in a protected class.'"  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001)

25   (quoting Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998)).  "Intentional discrimination

26   means that a defendant acted at least in part *because of* a plaintiff's protected status."  Serrano v.

27   Francis, 345 F.3d 1071, 1082 (9th Cir. 2003) (quoting Maynard v. City of San Jose, 37 F.3d 1396,

28   1404 (9th Cir. 1994)) (emphasis in original).  "Where the challenged governmental policy is 'facially

9

neural,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." Lee, 250 F.3d at 687 (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (264-66) (1977) (internal citations omitted)).  "The mere fact that [a] facially neutral polic[y] had a foreseeably disproportionate impact on an identifiable group does not mean that [it] violated the Equal Protection Clause." Id. at 687.

Defendants submitted evidence that at the time of the events in question, CDCR had a grooming regulation in place which required male inmates to keep their hair no longer than three inches in length. (U.F. 10.)  The regulation was promulgated to promote personal hygiene, to aid in the security of prisons, and to protect the safety of the public. (U.F. 11.)  In part, limiting the length of the hair to three inches facilitated searches by making it difficult to hide contraband and making it easier to search inmates' hair. (Id.)  Inmates housed in the SHU are disciplinary problems, often with a history of in-prison violence, and require more restrictive safety and security measures than lower security level inmates. (U.F. 12.)  Under OP 111R, which applied to SHU inmates at CCI, inmates who wore dreadlocks or braids and were not in compliance with the grooming regulation were removed from their cells only in limited circumstances, which did not include outdoor yard time.  (U.F. 14.)

Although plaintiff asserts generally that the policy targeted African-American prisoners because they are more likely to wear dreadlocks or braids, plaintiff has not submitted any evidence that the policy had a disproportionate impact on African-American prisoners.  Further, even assuming for the sake of argument that plaintiff is competent to testify that the policy had a disproportionate impact, plaintiff has not submitted any evidence that defendant Yarborough, in approving the policy, acted with an "invidious or discriminatory purpose," Lee, 250 F.3d at 686, by choosing that "particular course of action at least in part because of . . . its adverse effect . . ." on African-American prisoners, id. at 687 (internal quotations and citations omitted).  Therefore, defendant Yarborough is entitled to summary adjudication on plaintiff's claim that OP 111R was a racially discriminatory policy.

///

1    Turning to gender discrimination, the court takes judicial notice of the fact that CCI is a

2    men's prison.   The record is devoid of any evidence that OP 111R, which applied to inmates

3    incarcerated in CCI and housed in the SHU, was discriminatory because it treated plaintiff differently

4    than other similarly situated inmates based on plaintiff's gender.   Plaintiff's gender discrimination

5    claim fails as a matter of law and defendant is entitled to summary adjudication.

6                        2.        Eighth Amendment Conditions-of-Confinement Claim

7    Plaintiff was housed on the Facility 4B SHU yard at CCI from May 29, 2001, to December

8    27, 2001, and alleges that during that time period, he was denied outdoor exercise pursuant to OP

9    111 because he wore dreadlocks and was not in compliance with CDCR's grooming regulation.

10   (U.F. 9, 22; 2nd Amend. Comp., 13:1-9.)

11   To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

12   conditions must involve "the wanton and unnecessary infliction of pain . . . ." Rhodes v. Chapman,

13   452 U.S. 337, 347 (1981).   Although prison conditions may be restrictive and harsh, prison officials

14   must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety.

15   Id.; Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237,

16   1246 (9th Cir. 1982).   Where a prisoner alleges injuries stemming from unsafe conditions of

17   confinement, prison officials may be held liable only if they acted with "deliberate indifference to

18   a substantial risk of serious harm."   Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

19   The deliberate indifference standard involves an objective and a subjective prong.   First, the

20   alleged deprivation must be, in objective terms, "sufficiently serious . . . ." Farmer v. Brennan, 511

21   U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).   Second, the prison official

22   must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S.

23   at 837.   Thus, a prison official may be held liable under the Eighth Amendment for denying humane

24   conditions of confinement only if he knows that inmates face a substantial risk of harm and

25   disregards that risk by failing to take reasonable measures to abate it.   Id. at 837-45.   Prison officials

26   may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting

27   evidence of a reasonable, albeit unsuccessful, response to the risk.   Id. at 844-45.

28   ///

1    "'[S]ome form of regular outdoor exercise is extremely important to the psychological and

2    physical well being of the inmates.'" Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1995) (quoting

3    Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979)). Thus, "[the] deprivation of outdoor exercise

4    [can] constitute cruel and unusual punishment." Allen, 48 F.3d at 1087. While the temporary denial

5    of outdoor exercise with no medical effects is not a substantial deprivation, May v. Baldwin, 109

6    F.3d 557, 565 (9th Cir. 1997), in this Circuit, the deprivation of regular outdoor exercise for a period

7    of approximately seven months is sufficient to meet the objective requirement of the Eighth

8    Amendment analysis, and defendants do not argue otherwise. Lopez v. Smith, 203 F.3d 1122, 1132-

9    33 (9th Cir. 2000) (denial of all outdoor exercise for six weeks meets objective Eighth Amendment

10   requirement); Allen, 48 F.3d at 1086-88 (forty-five minutes of outdoor exercise per week for six

11   weeks meets objective Eighth Amendment requirement).

12         Defendants unquestionably have a need to preserve the safety and security of the institution,

13   which includes protecting staff and inmates. Bell v. Wolfish, 441 U.S. 520, 546-47 (1979).  In this

14   instance, plaintiff is serving a prison term following his conviction for first-degree murder, among

15   other crimes, and is a gang member. (U.F. 1, 4.) As previously set forth, inmates housed in the SHU

16   are disciplinary problems, often with a history of in-prison violence, and require more restrictive

17   safety and security measures than lower security level inmates. (U.F. 12.) Plaintiff was transferred

18   from a general population housing unit to the Facility 4A SHU on August 11, 1999, to serve an

19   eighteen-month sentence for battery on a non-inmate without serious injury and a concurrent six-

20   month term for battery on an inmate. (U.F. 5.) During the transfer process, plaintiff failed the SHU

21   Intake metal detector five times, and admitted to correctional officers that he had contraband in his

22   rectum and agreed to surrender it. (Id.) Following defecation, officers retrieved two bindles, one

23   of which contained nine single-edged razor blades, tobacco, matches, a striker, and two hand-rolled

24   cigarettes suspected of containing marijuana, and the other of which contained two zip lock bags,

25   a toilet paper wrapper, and six lists of words translated from Swahili to English. (Id.)  After

26   removing the contraband, plaintiff cleared the metal detector. (Id.)  As a result of this violation,

27   plaintiff received a consecutive fifteen-month term for possession of slashing weapons. (Id.)

28   ///

1    While housed in the Facility 4A SHU, plaintiff committed several disciplinary violations that

2  resulted in enhancements of his SHU term. (U.F. 6.)  The violations included mutual combat with

3  an inmate on the Crips exercise yard, and delaying a peace officer by refusing to uncover his cell

4  window on one occasion and by refusing to be handcuffed on another.  (Id.)

5    On May 22, 2001, a classification committee reviewed plaintiff's SHU placement and

6  retained him on the C/C Crip #1 Exercise Yard based on his request and on a review of his file.

7  (U.F. 8.)  On May 29, 2001, plaintiff was moved to the Facility 4B SHU. (U.F. 9.)  A week later,

8  plaintiff was seen by a classification committee there for his initial SHU review, and assigned to the

9  C/C Crip # 15 Exercise Yard.  (Id.)  Plaintiff was told him that unless he shaved his dreadlocks, he

10  would not be allowed access to the exercise yard to which he was assigned and that as long as he had

11  dreadlocks, he would only be allowed out of his cell to shower.  (Id.)

12    As previously stated, at that time CDCR had in place a regulation which provided in relevant

13  part that male inmates' hair must not be longer than three inches. (U.F. 10.)  Because inmates in the

14  SHU are disciplinary problems, they often refuse to comply with prison rules, including the

15  grooming regulations, even where they have no religious reason for not complying.  (U.F. 12.)

16  Correctional officers must still ensure the safety and security of staff, inmates, and the institution

17  when dealing with SHU inmates with long hair.  (Id.)  Under OP 111R, SHU inmates like plaintiff

18  who wore their hair in dreadlocks and who refused to cut it to comply with prison regulations were

19  required to separate the hair before leaving their cells to make searching and inspecting it easier.

20  (U.F. 14.)  Staff were authorized to remove an inmate with braids or dreadlocks from the cell for

21  escort to medical emergencies, showers, or for cell searches.  (Id.)  Staff were required to wand the

22  inmate's hair with a hand-held metal detector before escorting the inmate and conduct a thorough

23  visual inspection.  (Id.)  However, the metal wand would not disclose the presence of non-metallic

24  objects in the dreadlocks, such as weapons that inmates make from plastic or other non-metallic

25  materials.  (Id.)

26    On June 11, 2001, after his transfer to Facility 4B SHU, plaintiff was charged with a

27  disciplinary violation for possession of inmate-manufactured alcohol when officers found "pruno"

28  in a plastic bag wrapped in a blanket under the bottom bunk. (U.F. 15.)  The same day, plaintiff was

13

1  placed on the exercise yard because he said he was going to cut his hair. (Id.) However, when he

2  returned he had not cut the hair, but had only tacked his braids under his hair to conceal them from

3  staff.[5] (Id.)

4          On June 15, 2001, a correctional officer counseled plaintiff for noncompliance with the

5  grooming regulations because his hair was approximately six inches long. (U.F. 16.) Later that day,

6  the same officer charged plaintiff with delaying an officer in the performance of his duties when

7  plaintiff twice refused to take down some non-transparent paper covering his cell door window. (Id.)

8          On July 26, 2001, plaintiff was charged with a disciplinary violation for refusing to accept

9  a compatible cell mate, after stating that he did not want a "cellie." (U.F. 17.) As a result, a sergeant

10 suspended plaintiff's scheduled yard time until a classification committee could review his yard

11 needs. (Id.)

12         On July 30, 2001, plaintiff was charged with a disciplinary violation for having braids that

13 were six to ten inches long, in violation of the grooming standards. (U.F. 18.) The reporting

14 employee later noted that plaintiff's hair was approximately thirteen inches long in places. (Id.)

15         On August 12, 2001, a correctional officer who was processing inmates for the exercise yard

16 noted that plaintiff had not removed and separated his braids before leaving his cell to go to the yard

17 as required by CCI Operational Procedure No. 111R. (U.F. 19.) Plaintiff also refused to use the hair

18 clippers available on the yard to cut his hair to conform with regulations limiting the length of an

19 inmate's hair to three inches. (Id.)

20         On November 6, 2001, a classification services representative approved plaintiff's release

21 to the general population upon the expiration of his SHU term and approved his transfer to Pelican

22 Bay State Prison. (U.F. 20.) Plaintiff's SHU term expired on December 10, 2001, and he was placed

23 in administrative segregation pending his transfer to another institution. (U.F. 21.) Thereafter, on

24 December 27, 2001, plaintiff was transferred from the Facility 4B SHU to the general population.

25 (U.F. 22.)

26 ///

27

28
          [5] Except for this occasion, plaintiff did not go to the yard when he was housed in the IV-B SHU. (U.F. 15.)

1    Defendants argue that plaintiff was deemed to pose a security risk and precluded from

2    participating in outdoor exercise due to his failure to comply with the grooming regulation, which

3    had been enacted in part to address safety and security concerns, and point out that during the time

4    plaintiff was housed in the SHU, he continued to commit disciplinary violations.

5    In his opposition, plaintiff argues that while he was housed on the Facility 4A SHU, he had

6    dreadlocks, but was still allowed outdoor exercise, despite the existence of OP 111R, and questions

7    why no security concerns were noted on June 7, 2001, when plaintiff was cleared for and assigned

8    to a group yard.  (Opp., 9:3-8 & 10:4-7.)

9    At issue is whether, in denying plaintiff outdoor exercise for approximately seven months,

10   defendants knowingly disregarded "a substantial risk of serious harm . . ." to plaintiff.  Frost, 152

11   F.3d at 1128.  It is undisputed that plaintiff was in the SHU for disciplinary violations and continued

12   to commit disciplinary violations while there, and that plaintiff was excluded from the exercise yard

13   pursuant to OP 111R because his hairstyle was not in compliance with CDCR's grooming regulation,

14   enacted in part for security reasons.  Thus, the key to participation in outdoor exercise was within

15   plaintiff's control.

16   The court accepts as true plaintiff's allegation that he held sincere religious beliefs which

17   would have been offended by cutting his hair to comply with the grooming policy.  However,

18   plaintiff's own behavior earned him a SHU term and caused him to be subjected him to stricter

19   conditions than those found in general population, and the decision whether to comply with the

20   grooming regulation and thereby enjoy outdoor yard time rested with plaintiff.  Plaintiff chose to

21   adhere to his religious beliefs by not cutting his hair as required by the regulation.  Defendants

22   precluded plaintiff from access to outdoor yard time for security reasons due to his failure to cut his

23   hair as required by the regulation.  The issue here is not whether plaintiff's religious rights were

24   burdened by the policy but whether defendants subjected plaintiff to cruel and unusual punishment.[6]

25   The facts do not support a claim that defendants violated plaintiff's rights under the Eighth

26   Amendment by acting with deliberate indifference.  Because plaintiff has not submitted evidence

27

28   [6] The court reiterates that plaintiff's First Amendment free exercise claim and RLUIPA claim were dismissed.

1  sufficient to raise a triable issue of fact regarding the subjective element of his Eighth Amendment
2  claim, defendants are entitled to summary adjudication.

3           E.      Conclusion

4           The court finds that defendants are entitled to summary judgment on the merits of plaintiff's
5  equal protection and Eighth Amendment claims against them.  Because of this, the court does not
6  reach defendants' argument that they are entitled to qualified immunity.

7           For the reasons set forth herein, it is HEREBY RECOMMENDED that defendants' motion
8  for summary judgment, filed June 1, 2006, be GRANTED in its entirety, thus concluding this matter
9  in its entirety.

10          These Findings and Recommendations will be submitted to the United States District Judge
11  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30)**
12  **days** after being served with these Findings and Recommendations, the parties may file written
13  objections with the court.  The document should be captioned "Objections to Magistrate Judge's
14  Findings and Recommendations."  The parties are advised that failure to file objections within the
15  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d
16  1153 (9th Cir. 1991).

17

18  IT IS SO ORDERED.

19  **Dated:    November 29, 2006**              _____/s/ **Sandra M. Snyder**_____
20  icido3                                     UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28

16